UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| John Brent O'Dea | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Air Canada | ) | |
| Ronald Reagan National Airport, | ) | |
| Terminal A, 2601 S. Smith Blvd. | ) | |
| Arlington, VA 22202 | ) | **Jury Trial Demanded** |
| | ) | |
| Defendant. | ) | |

**CIVIL COMPLAINT FOR MONETARY, INJUNCTIVE
AND DECLARATORY RELIEF, AND DEMAND FOR JURY**

Plaintiff John Brent O'Dea, by and through counsel, hereby files this Civil Complaint.

A.    **Nature of Case**

1.    This is a suit for disability discrimination, failure to engage in the interactive process and provide reasonable accommodations, and retaliation, in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (hereafter, "ADA"), as amended, and under the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. §§ 1132, 1161(a), and 1163(d)(2).

B.    **Jurisdiction and Venue**

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and pursuant to § 107(a) of the ADA, 42 U.S.C. § 12117(a), incorporating § 706(f)(3) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3).

4.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and –(b)(2), and pursuant to § 107(a) of the ADA, 42 U.S.C. § 12117(a), incorporating § 706(f)(3) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3).  This is the judicial district in which the unlawful

1

employment practices are alleged to have been committed, and it is the judicial district where the employment records relevant to Plaintiff's claims are maintained and administered.

### C.    Parties

5.    Plaintiff John Brent O'Dea is an adult man and has been a resident of the District of Columbia at all relevant times.  He has been employed by Air Canada since November 5, 1990.  Since 1995, he has worked in Air Canada's facility at Reagan National Airport.  At all relevant times, he has been assigned to work "below the wing" as a J06 Airport Services Coordinator.

6.    Air Canada is a foreign corporation headquartered in Montreal, Quebec, Canada, has a business facility located in this District, and flies planes in and out of Reagan National Airport several times a day.

7.    Upon information and belief, Air Canada has had more than 500 employees in the United States at all times relevant to this action.

8.    Air Canada is engaged in an industry affecting commerce.

9.    Air Canada is an employer within the meaning of § 101(5) of the ADA, 42 U.S.C. § 12111(5).

10.    Air Canada was covered by COBRA at all relevant times.

### D.    The Facts

11.    Plaintiff has performed his job satisfactorily for many years.

12.    Plaintiff has worked as an Air Canada J06 Airport Services Coordinator at Terminal A of Reagan National Airport since about 2001.  He routinely interacts with flight crews, fuelers, and ramp agents, as well as supporting the gate agents by pulling from the plane the luggage of passengers who do not show up for the flight in time, re-routing bags to conform to passengers' re-routing, and working on maintenance problems. He performs walk-around

2

inspections of aircraft when they land and arrive at the gate, checking for damage from bird strikes, belt loader problems, hydraulic leaks, fuel leaks, etc. He often has to go to the fuel truck with the fuel order for a plane and make last-minute adjustments. These tasks are called "below the wing" tasks, and jet fumes suffuse all of this work. This exposure to fumes has never caused any problem to Plaintiff.

13. Plaintiff's job as J06 Airport Services Coordinator also has "above the wing" tasks, such as briefing the customer service staff—the gate agents, check-in staff, and customer service staff—about what to expect that day, helping to check in passengers at the check-in counter, moving the jet bridge and connecting it to the aircraft, helping scan the boarding passes, canvassing for volunteers in oversold flight situations, sometimes crossing the tarmac, and the like.

14. The Air Canada J05 designation is split into two different jobs. Employees are either a J05 Aircraft Services Coordinator working exclusively below the wing, or a J05 Lead Customer Service Agent working exclusively above the wing.

15. At National Airport, Air Canada has not had a J05 Lead Customer Service Agent since about 2001.

16. Air Canada employees working in the J05 Aircraft Service Coordinator job are routinely and frequently exposed to the same jet fumes as, and to a greater extent than, J06 Airport Service Coordinators.

17. The management of Air Canada has been aware, at all times from 1990 to the present, that everyone working as a J05 Aircraft Service Coordinator or J06 Airport Service Coordinator is routinely and frequently exposed to jet fumes as described above.

3

18.     The J05 job is a lower-level job, and pays less than the J06 Airport Service Coordinator job.

19.     Air Canada's job descriptions for the J06 and J05 positions are attached as Exhibit 1.

20.     The management of Air Canada has been aware, at all times from 1990 to the present, that everyone working as a J05 or J06 Airport Service Coordinator is routinely and frequently exposed to jet fumes as described above.

21.     Plaintiff has had severe respiratory problems during all relevant times.  In 2012, he was diagnosed with chronic obstructive pulmonary disease ("COPD"). In 2013, he was hospitalized with a diagnosis of interstitial lung disease.  Plaintiff also has asthma, triggered by severe allergies to airborne pollutants from fellow employees of Air Canada wearing excessive perfumes, using nail polish or its remover, strongly scented oils and lotions, and their cigarette and e-cigarette smoke, near to his work area.

22.     Throughout the entire period from 2012 to the present, Plaintiff has not been seriously bothered by exposure to passengers' excessive perfumes, colognes, and other scents because he is exposed for only a few minutes to passengers with such scents, and no passenger smokes or applies nail polish or nail polish remover at the ticket counters.

23.     Plaintiff has also had respiratory problems caused by the dust and airborne particles caused by construction work at Reagan National Airport, but no claim is made against Air Canada for that part of his problems.

24.     Plaintiff and his pulmonologist each promptly communicated his diagnoses to Air Canada.

4

25.    Plaintiff's respiratory problems significantly interfere with the major life activity of breathing, and with the respiratory major body function, within the meaning of §3(2) of the ADA, 42 U.S.C. § 12102(2).

26.    Plaintiff is disabled from a broad class of jobs within the meaning of § 3(1)(A) of the ADA, 42 U.S.C. § 12102(1)(A).

27.    Air Canada has been aware of Plaintiff's disability at all relevant times.  Plaintiff and his pulmonologist have repeatedly communicated with Air Canada about his respiratory problems, from at least 2013 on.

28.    On March 8, 2016, Plaintiff filed a charge of disability discrimination and retaliation with the U.S. Equal Employment Opportunity Commission.  Plaintiff received a Notice of Right to Sue but did not file suit based on that charge.

29.    Beginning in 2012, Plaintiff has had to leave work several times because of serious difficulties breathing.  On some of these occasions, he had to leave directly for a hospital.  Some of these hospital stays have been for as little as several hours or as long as almost a month. Robert Lawler, an Air Canada manager, once drove Plaintiff to the hospital.

30.    On each of the occasions when Plaintiff had to be evacuated by ambulance, Plaintiff's respiratory problems were caused by Air Canada's employees wearing excessive perfumes, using nail polish or its remover, strongly scented oils and lotions, or their cigarette and e-cigarette smoke, near to his work area.

31.    Plaintiff has a not only a disability but a record of a disability, within the meaning of § 3(1)(B) of the ADA, 42 U.S.C. § 12102(1)(B).

32.    Plaintiff has at all relevant times repeatedly complained to Air Canada that his respiratory problems were caused by Air Canada's employees wearing excessive perfumes, using

nail polish or its remover, strongly scented oils and lotions, and their cigarette and e-cigarette smoke, near to his work area.

33. Air Canada has a written policy called the Air Canada Grooming Policy forbidding employees from subjecting other employees and customers to excessive fragrances and odors. Employees are supposed to use "subtle fragrances, in non-offensive amounts." The policy also forbids "the application of fragrances, as well as the removal of and re-application of nail polish in the break/locker room." The policy states that this is only supposed to be done "during your breaks and only in the restrooms."

34. Air Canada reminds employees of the policy from time to time, but does nothing else to enforce the policy.

35. Plaintiff has informed Air Canada numerous times that employees are violating the policy, but Air Canada has never done anything to enforce this policy other than to remind employees of its existence. In the past three years, Plaintiff has documentation that he complained of this problem on February 26, 2016; February 29, 2016; April 5, 2016 (stating that Air Canada's March 1, 2006 reminder to all employees of its Grooming Policy was not working); and August 12, 2016. In addition, communications on Plaintiff's behalf were sent to Air Canada by his union on February 1, 2017 and by his pulmonologist in the last three years on December 2, 2016; January 8, 2017 (Work Status and Capabilities Form & Release referring to "perfumes, nail polish0, dust exposure"); February 15, 2017 (answers to Air Canada's questionnaire identifying problem substances as "aeroallergens and irritants (perfumes)"). Plaintiff also made repeated oral complaints without maintaining a record of the dates.

36. Air Canada has repeatedly attempted to shift the burden of enforcement to Plaintiff by demanding that he state whether he wants Air Canada to discipline particular

6

employees for violating the policy, exposing Plaintiff to the risk of retaliation by other employees if he asks for them to be disciplined.  For example, Plaintiff's February 26, 2016 complaint to Chris Messina, Air Canada's Manager of Northeast Airports, stated:

> Is there an official HR policy that states employees should refrain from wearing EXCESSIVE PERFUME to work.

> I walked into the break room today and started choking it was so obnoxious. I had to leave and had a severe asthma attack. I have walked in on numerous occasions and asked that nail polish and nail polish remover be put away as well. I can forward a picture if you need one.

> I should not have to be subjected to these strong scents that harm my health. Can you please send out a meme asap.

Mr. Messina's March 29, 2016 response stated:

> Hi Brent –

> Is there a particular agent? If so who, so I can speak to her …

> Chris

37.     Plaintiff explained this problem to Mr. Messina in a February 29, 2016 e-mail response

> Chris,

> The issue with this problem will be the back lash. Unfortunately, most individuals take things too personally.

> I believe its lleene, and I've asked all of the pm agents to refrain from using nail polish remover and nail polish on numerous occasions.

> I am highly allergic to any strong scent. There must be a company policy in place.

> Brent

38.     Mr. Messina responded to Plaintiff on March 1, 2016:

> Hi Brent

> In that case, I will start with an email to the entire staff and we can see if that helps, if not, I will then speak to the offenders ...

Chris Messina
Manager, Airports, Northeast USA

On that date, Mr. Messina sent an e-mail to all Air Canada's employees working at Reagan National Airport reminding them of Air Canada's Grooming Policy.

39.    On information and belief, Air Canada's managers never did speak to the employees violating its policy.

40.    Air Canada has been well aware of the employees violating the policy, and could indeed observe them doing so in a snap inspection if it so desired.

41.    Air Canada is aware that its periodic re-issuance of its Grooming Policy has not been effective in preventing violations of the Policy. Air Canada is aware that some employees change their behavior for a few days and then return to their former behavior, and some employees simply ignore the warnings.

42.    The office used by Air Canada managers is just a few feet away from the break room. They can see the routine employee violations of Air Canada policies.

43.    Air Canada managers do use the break room themselves from time to time. They can see for themselves that employees are violating these policies, and can take immediate action if they choose to.

44.    On Tuesday, December 29, 2015, Plaintiff took the picture attached as Exhibit 2, of a table in the break room.

45.    The picture shows nail polish, nail polish remover, and the like. The situation depicted has been close to a daily occurrence since 2012, notwithstanding Air Canada's periodic re-issuance of its Grooming Policy.

46.    Air Canada managers would have to have observed, hundreds of times, the same conditions that are depicted in the picture.

8

47.    Upon information and belief, Air Canada has never disciplined any employees for violating these policies.

48.    The most recent time Plaintiff had to be hospitalized was November 21, 2016, for a period of several days.  Plaintiff was medically cleared to return to work on or about mid-January 2017, but Air Canada refused to allow him to return to work.

49.    Air Canada barred Plaintiff from working in his job, from mid-January 2017 forward, because of its pretense that it needed further documentation from me to show that my breathing problems were not caused by exposure to jet fumes.

50.    As soon as Plaintiff learned of this justification, he protested to Mr. Wichmann that jet fumes did not trigger his breathing disabilities.

51.    Air Canada has for years prior to barring him from employment well understood the nature of the pollutants that trigger Plaintiff's respiratory problems.  He has told them for years that his problems breathing in Air Canada's work spaces were caused by Air Canada's employees wearing excessive perfumes, using nail polish or its remover, strongly scented oils and lotions, or their cigarette and e-cigarette smoke, near to his work area.

52.    Plaintiff can perform all essential functions of his job at all times except when he is having a severe respiratory problem because of Air Canada's employees wearing excessive perfumes, using nail polish or its remover, strongly scented oils and lotions, or their cigarette and e-cigarette smoke, near to his work area.

53.    With the following reasonable accommodations, Plaintiff can perform all the essential functions of his job at all times:

   c.    Air Canada's enforcement of the Air Canada Grooming Policy forbidding employees from subjecting other employees and customers to excessive fragrances and odors;

d.      Air Canada's continuing to locate Plaintiff's main office in the ramp area, where he is exposed to jet fumes but not exposed to excessive perfumes, nail polish, nail polish remover, strongly scented oils and lotions, and their cigarette or e-cigarette smoke; and

e.      Air Canada's use of its power to instruct Swissport to prevent Swissport's employee from smoking in the Swissport ramp office.

54.     When Air Canada barred Plaintiff from working in any job in mid-January 2017, and refused to relent unless it obtained complete medical records, and when Air Canada was notified that the fax number it had provided as the only means by which the demanded records could be transmitted was not working because it was always busy, it would have been a reasonable accommodation for Air Canada to have provided a fax number that worked and was not always busy, or to have provided an e-mail address for receipt of the records it had demanded, and so to allow Plaintiff to resume performing the essential functions of his job.

55.     Air Canada would not suffer any undue hardship in enforcing its own grooming policy.

56.     Air Canada assigned Plaintiff to use the ramp office at Reagan National Airport during the period from about 2005 to October 2016.  The ramp office was located on the tarmac below Gate 3.  During this time, Plaintiff's respiratory problems were fewer and less serious.

57.     In about October 2016, Air Canada reassigned Plaintiff to use the upstairs office in the terminal building.  During this time, Plaintiff's respiratory problems increased substantially. Plaintiff complained to

58.     The upstairs office had poor ventilation, and some employees routinely sprayed perfume on themselves, or used nail polish or nail polish removers, applied scented oils, used

scented hand creams or lotions, or smoked cigarettes, in the break room.  Scott Wichmann, Air Canada's highest-ranking local manager in parts of 2016 and 2017, routinely smoked in the break room.

59.    Plaintiff's desk in the upstairs office was close enough to the break room that these strong smells caused him significant breathing difficulties,

60.    If Air Canada's employees had done these things in the rest rooms, which were much farther from Plaintiff's desk than the break room, Plaintiff would have had significantly fewer difficulties.

61.    Plaintiff could work by himself in the ramp office, without being exposed to the strong scents used by Air Canada's employees.

62.    Air Canada would not suffer any undue hardship by permanently assigning Plaintiff to using the ramp office.

63.    Air Canada has a contract with Swissport to provide below-the-wing services to aircraft, including loading and unloading baggage and cargo.  The Swissport ramp office is next to Air Canada's ramp office.  Air Canada can exert control over Swissport employees' conduct through its contract.

64.    In the Air Canada ramp office, Plaintiff was sometimes exposed to smoke from electronic and regular cigarettes smoked by a Swissport employee.  While there is a smoking area used by others, this employee smokes in the Swissport ramp office instead.  This created some breathing difficulties for him, but at a much lesser level than when he was assigned to work in the upstairs office.

65.    Plaintiff has repeatedly complained to Air Canada managers and others that the Swissport employee's smoking in the Swissport ramp office is a major airway irritant and trigger

11

for my respiratory problems.  Neither Air Canada nor Swissport took any effective action to curb this irritant.

66.    It would have been a reasonable accommodation for Air Canada to have used its power to instruct Swissport to prevent its employee smoking in the Swissport ramp office.

67.    It would not have been unduly burdensome for Air Canada to have provided and enforced such an instruction to Swissport.

68.    Air Canada refused to do anything, and did not engage in the interactive process.

69.    Plaintiff is a qualified individual, within the meaning of § 101(8) of the ADA, 42 U.S.C. § 12111(8).

70.    Jet fumes do not trigger any respiratory problems for Plaintiff.

71.    Air Canada has known at all relevant times that jet fumes do not trigger any respiratory problems for Plaintiff:

c.    In the twenty-seven years from November 1990 to the Fall of 2017, and during the periods after his diagnoses in 2012, Plaintiff has worked around jets and their fumes, without ever complaining to Air Canada that jet fumes bothered him in any way;

d.    In January 2017, Plaintiff told Scott Wichmann, Air Canada's Customer Service Manager, that Plaintiff did not have a problem working around jet fumes.

e.    In February 2017, Plaintiff told this to all the managers present at the interactive meeting.

f.    It is self-evident that persons with respiratory problems can readily identify the substances that cause serious problems with their breathing, and those that do not;

g.    Air Canada knew that Plaintiff had an office on the ramp, which was routinely suffused with jet fumes, and worked among planes in an atmosphere routinely suffused with jet fumes, and never had a respiratory emergency while doing so;

h.    Air Canada knew that Plaintiff's job involved his walking across the tarmac, maneuvering jet bridges, working around fuel trucks, handling baggage for some passengers, and other tasks that require work in areas of concentrated jet fumes, several times a day every day, and Air Canada knew that these tasks and their exposure to jet fumes never caused any of Plaintiff's respiratory problems at work;

i.    Air Canada knew that, when Plaintiff started to have breathing problems from exposure to Air Canada's employees wearing excessive perfumes, using nail polish or its remover, strongly scented oils and lotions, or their cigarette and e-cigarette smoke, he went to his ramp office to recover from the breathing problems; and

j.    On April 13, 2017, Air Canada offered Plaintiff a demotion to J05 Aircraft Services Coordinator, that would allow him to return to work at reduced pay but placing him primarily on the ramp where he would be more exposed to jet fumes than he had been in the higher-paying J06 Airport Services Coordinator from which it had removed him. Air Canada described this as satisfying Plaintiff's reasonable-accommodation request.

72.    In mid-January 2017, Air Canada falsely and in bad faith:

a.    Barred Plaintiff from working in his job, from mid-January 2017 forward, because of its pretense that it needed further documentation to show that his breathing problems were not caused by exposure to jet fumes.

13

b.      Pretended that it did not know which pollutants triggered Plaintiff's breathing difficulties;

c.      Pretended that it did not know that jet fumes did not cause Plaintiff any breathing difficulties;

d.      Based on these false and bad-faith pretenses, Defendant refused to permit Plaintiff to work in any airport job between mid-January and mid-September 2017; and

e.      Based on these false and bad-faith pretenses, Defendant demanded virtually complete medical information from Plaintiff and from his pulmonologist.

73.     Air Canada did not have any justification for requiring further medical information from Plaintiff in January 2017 and later.  Air Canada already knew of Plaintiff's disability, his diagnosis, the employee conduct that triggered his respiratory flare-ups, the severity of those flare-ups, and the fact that jet fumes had never caused him a problem.

74.     Air Canada then prevented its own receipt of the documentation it had demanded, by demanding that it be submitted only by fax to a specific fax number, and then by having that fax number effectively inoperable.

75.     Plaintiff notified Air Canada repeatedly that its fax machine was not working, and asked for a working fax number or for an e-mail address so that the documents cold be scanned and sent by e-mail.

76.     Air Canada did not respond.

77.     It would have been a reasonable accommodation for Air Canada to have provided a fax number that worked and was not always busy, or to have provided an e-mail address for receipt of the records it had demanded.

78.     Air Canada ignored Plaintiff's request for this reasonable accommodation.

14

79.     After Plaintiff's pulmonologist finally mailed the documents to Air Canada, Air Canada still pretended in bad faith that the records were not enough, and still barred Plaintiff from working in any position for Air Canada.

80.     By pretending that Plaintiff could not work in any airport job because of exposure to fumes, smells and dust, Air Canada exaggerated Plaintiff's disability and regarded him as disabled to a much greater extent than he was, and from a broad class of jobs.

81.     Plaintiff could not obtain an airport services or aircraft services job with any other airline because Air Canada bars its employees from working for any other airline.  As a result, Plaintiff could not obtain a job in the only field for which he was qualified by education and experience without providing an excuse for Air Canada to fire him and potentially destroy his right to reinstatement.

82.     In January 2017 and April 2017, Air Canada offered Plaintiff a J05 Airport Services Coordinator position, a demotion to a lower-paying job but which would have exposed plaintiff to even more jet fumes than his J06 Airport Services Coordinator job..

83.     Plaintiff rejected the demotion because his J06 position was grandfathered and would have remained despite Air Canada's phasing out the job category elsewhere, and accepting the demotion might have locked him into a career-long lower-paid position,

84.     When Air Canada reduced Plaintiff's hours to zero, Air Canada was required to ensure that Plaintiff received notice of COBRA continuation coverage for health insurance and prescriptions.

85.     Health coverage was extremely important to Plaintiff because of his hospitalizations, continuing need for treatment by a pulmonologist, and his breathing disability.

86.     Air Canada was well aware that Plaintiff had an unusually great need for continued health insurance and prescription coverage.

87.     Air Canada did not ever provide Plaintiff with notice of his right to COBRA continuation coverage.

88.     At first, Air Canada's insurance plans covered Plaintiff's medical and prescription expenses.  On March 28, 2017, however, Plaintiff tried to pick up prescription drugs and was notified by his pharmacy that his insurance coverage had been revoked.

89.     When Plaintiff checked with the insurance carrier, he discovered that Air Canada had retroactively backdated its cancellation of his insurance to mid-January 2017.

90.     Plaintiff was able to obtain replacement insurance coverage in about July 2017, when he qualified for Medicare and signed up under that program.

91.     In May 2017, during the time in which Plaintiff was without insurance coverage, he attempted to accept Air Canada's January 2017 offer of demotion to a J05 Aircraft Services Coordinator position and thereby regain coverage.

92.     Air Canada then effectively withdrew its offer by conditioning the offer on its receipt of the same documentation it had previously demanded to reinstate Plaintiff to his J06 position, but which it had not previously demanded for the J05 demotion when that had been offered in January 2017.

93.     Air Canada reinstated Plaintiff on or about September 19, 2017, only after Plaintiff retained counsel who wrote to Air Canada and included he same type of information that had already been sent to Air Canada.

### E.     Exhaustion

94.     Plaintiff filed an EEOC charge of disability discrimination and retaliation in violation of the ADA on June 9, 2017.

95.     Plaintiff amended his EEOC charge on February 21, 2018, to include "regarded as" discrimination and further acts of retaliation, in violation of the ADA, and asked that it relate back to his original June 9, 2017 charge.

96.     The EEOC mailed a Notice of Right to Sue dated May 24, 2018, to counsel for Plaintiff.

97.     Counsel for Plaintiff received the Notice of Right to Sue on May 29, 2018.

98.     This lawsuit is filed within the 90-day period after receipt of the Notice of Right to Sue.

### F.      Compensatory Damages

99.      Plaintiff suffered substantial mental anguish that was caused by Air Canada's actions:

a.   Plaintiff has had months of mostly sleepless nights, because of anxiety about his situation, both as to his job and as to the lack of insurance in light of his serious respiratory disability and medical history.

b.   Plaintiff's stress caused by Air Canada's actions described above increased the severity of his symptoms from his respiratory problems.

c.   Plaintiff's stress caused by Air Canada's actions described above was substantially further increased once he learned he had no medical or prescription-drug insurance.

d.   This stress caused Plaintiff to need to increase his blood pressure medications. As a result, he gained considerable weight.

17

### G.    Punitive Damages

100.    Air Canada acted with malice or with reckless indifference to Plaintiff's Federally-protected rights.

### H.    Violations of Law

#### 1.    Count I: Violation of the ADA by Discriminating Against Plaintiff Because of His Disability

101.    Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

102.    Air Canada has intentionally discriminated against Plaintiff because of his disability in violation of § 102(a) of the ADA, 42 U.S.C. § 12112(a).

#### 2.    Count II: Violation of the ADA by Failing or Refusing to Make Reasonable Accommodations to Plaintiff

103.    Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

104.    Air Canada has intentionally discriminated against Plaintiff by failing or refusing to make reasonable accommodations to Plaintiff because of his disability, and by failing to engage in good faith in the interactive dialogue in violation of § 102(a) and 102(b)(5) of the ADA, 42 U.S.C. § 12112(a), 12112(b)(5).

#### 3.    Count III: Violation of the ADA by Discriminating Against Plaintiff Because of His Perceived Disability

105.    Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

106.    Air Canada has wrongly and in bad faith regarded Plaintiff as having a breathing disability triggered by exposure to jet fumes, and has harmed Plaintiff because of that perceived disability.

107.    Air Canada has intentionally discriminated against Plaintiff because of his perceived disability with respect to jet fumes, in violation of § 102 of the ADA, 42 U.S.C. § 12112.

**4.** **Count IV: Violation of the ADA By Demanding Unnecessary Medical Information**

108.     Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

109.     Air Canada has violated § 102(a) and § 102(d)(4) of the ADA, 42 U.S.C. § 12112(a) and § 12112(d)(4), by demanding in bad faith medical verification of Plaintiff's information that his breathing disability was not triggered by jet fumes, when Air Canada already knew that Plaintiff's information that his breathing disability was not triggered by jet fumes.

**5.** **Count V: Retaliation**

110.     Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

111.     Air Canada has retaliated against Plaintiff, in violation of § 503(a) of the ADA, 42 U.S.C. § 12203(a), and has coerced, intimidated, threatened, or interfered with Plaintiff, in violation of § 503(b) of the ADA, 42 U.S.C. § 12203(b), for exercising his protected rights:

c.       to complain internally to Air Canada's management about the problems he suffers when Air Canada's employees wear excessive perfumes, use nail polish or its remover, and smoke cigarettes, strongly scented oils and lotions, or their cigarette and e-cigarette smoke, near to his work area;

d.       to have his pulmonologist and his union complain on his behalf to Air Canada's management about these topics; and

e.       to file and prosecute charges with the U.S. Equal Employment Opportunity Commission.

**6.** **Count VI: Violation of COBRA**

112.     Paragraphs 1-100 above are incorporated by reference as if fully alleged herein.

113.     Air Canada has violated COBRA, 29 U.S.C. §§ 1132, 1161(a), and 1163(d)(2).

## I.    Jury Demand

Plaintiff prays trial by jury for all issues in this Complaint that are triable by jury.

## J.    Prayer

WHEREFORE, plaintiff prays that this Court award him:

A.    An injunction against further discrimination, improper demands for medical information, and retaliation;

B.    A declaration that Plaintiff's rights under the ADA to be free of discrimination and retaliation were violated;

C.    Back pay, with interest, in an amount to be determined;

D.    Compensatory damages in an amount to be determined;

E.    Punitive damages in an amount to be determined;

F.    Reasonable attorneys' fees and expenses (including any expert fees and expenses) in an amount to be determined;

G.    All penalties available under COBRA; and

H.    Any other relief this Honorable Court deems just and proper to award

Respectfully submitted,


/s/ Nicholas Woodfield
Nicholas Woodfield, Esq.
VSB# 48938
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com

Richard T. Seymour, Esq.
*Admission pro hac vice to be sought* Law
Office of Richard T. Seymour, P.L.L.C.
Suite 900, Brawner Building
888 17th Street, N.W.
Washington, DC 20006-3307
Telephone: (202) 785-2145
Cell:       (202) 549-1454
Facsimile:  (800) 805-1065
E-mail: rick@rickseymourlaw.net

*Attorneys for Plaintiff*

20

# Exhibit 1

20170910_204215_1505095463388.jpg

**Job Description**                    **Date Original:** June
26, 2000

**Revised:**

March 15, 2012

**Position Title:** Airport Services Coordinator

**Group:** J06

**Location:** Any Airport Work Unit

**Basic Purpose Of Position**
Under the direction of the Manager and while remaining a working member of the Customer Service Agent group, provide leadership, direction and training to employees in all Airport classifications. The Incumbent will provide Air Canada presence to protect Company assets with regard to contractor interface at airport to ensure proper provision and coordination of all contracted service.

This position may be called upon to perform duties of the Lead Customer Service Agent and the Aircraft Coordinator at the same time and/or may be called upon to assume responsibility for directing the efforts of Lead Customer Service Agents and/or Aircraft Services Coordinators.

**Position Reports To:** Manager, Customer Service and/or
                        Customer Service Manager

**Receives Functional Direction From:** Managers, Lead Customer Service
Agents, Aircraft Service Coordinators.

**Receives Functional Direction From:** Same as above.

**Gives Functional Direction To:**  Aircraft Service Coordinators, Lead Customer Service Agents, Customer Service Agents, Ground handling Company Employees or others contracted to provide service for Air Canada.

**KEY ACTIVITIES/RESPONSIBILITIES DUTIES**
·         Provide leadership ad direction to Lead Customer Service Agents, Aircraft Service Coordinators, Customer Service Agents and contracted providers of service.
·         In the absence of management, assume overall responsibility for duties of the Work Unit on shift.
·         Allocate the available manpower to meet demands, including the booking of OT and granting of RO or Shift/Day trades, changing of shifts and/or duty assignments as necessary.
·         Monitor and direct the efforts of contracted suppliers of service ensuring both service and quality standards are met.
·         In the absence of management, make, carry out, and

**Job Description**

**Date Original:** May 25, 1997
**Revised:** March 15, 2012

**Position Title:** Aircraft Service Coordinator

**Group:** J05

**Location:** Any Airport Work Unit

**Basic Purpose of Position**

Under the direction of the Manager, provide Air Canada presence to protect Company assets with regard to contractor interface at airport to ensure proper provision and coordination of all aircraft service.

**Position Reports To:**     Manager, Customer Service and/or
Customer Service Manager

**Receives Functional Direction From:** Same as Above

**Gives Functional Direction To:** Customer Service Agents, Ground Handling Company Employees or others contracted to provide service for Air Canada

**KEY ACTIVITIES/RESPONSIBILITIES DUTIES**
- Perform all duties of a Customer Service Agent.
- After training perform the duties of Lead Customer Service Agent Airport.
- Day of Flight - coordinate the operational requirements of handling charters/extra sections.
- Provide Air Canada presence and coordinate the handling of other carriers.
- Monitor and coordinate fix on ramp side facilities maintenance.
- Coordinate the gate assignment process where required.
- Perform on-the-job training.
- May be called upon to lead formal training classes, both basic and follow up.
- Liaise with other Work Units, Ground Handling Companies, Caterer, Governmental and Airport Authorities.
- Monitor & audit the provision of contracted services, report on findings, recommend improvements.
- Coordinate all Ramp handling functions.
- Investigate and complete In-Flight incident report.
- Conduct accident investigation and report on findings, recommend action.
- Coordinate, monitor and action as necessary spare parts storage and administration including the acquisition of spare parts from other carriers for use on Company aircraft and signing receipts for same.
- Conduct audits of commissary inventory levels.
- In the absence of Manager, make, carry out and document decisions necessary to ensure the efficient operation of the work unit and protect Company interests.
- Inform staff either verbally or in writing, as required, of changes in rules, methods or procedures.

805.1

**Job Description**

**Date Original:** May 25, 1997
**Revised:** March 15, 2012

**Position Title:** Lead Customer Service Agent - Airport

**Group:** J05

**Location:** Any Airport Work Unit

**Basic Purpose Of Position**
Under the direction of the Manager and while remaining a working member of the Customer Service Agent group, provide leadership, direction and training to employees in the basic classification (s), as well as performing Customer Service Agent duties.

**Position Reports To:** Manager, Customer Service and/or
Customer Service Manager

**Receives Functional Direction From:** Same as above.

**Gives Functional Direction To:** Customer Service Agents, Ground Handling Company Employees or others contracted to provide service for Air Canada.

**KEY ACTIVITIES / RESPONSIBILITIES DUTIES**
- Perform all duties of a Customer Service Agent
- May be assigned to perform the duties of an Aircraft Service Coordinator.
- Under the direction of the Manager develop work schedules for the Work Unit.
- Coordinate work assignments ensuring all agents maintain a high level of proficiency in all aspects of the job of Customer Service Agent.
- Observe workflow and assign, reassign Agents as required.
- Coordinate routine administration, operational requirements, including planning / calling of overtime as delegated.
- Assign daily lunch / breaks in a manner consistent with the collective agreement and the requirements of the work unit, providing for efficient use of available resources,
- Perform on-the-job training.
- May be called upon to lead formal training classes, both basic and follow up.
- Liaise with other Work Units, ground handling Companies, Caterer, Governmental and Airport Authorities.
- Monitor and audit the provisions of contracted services, report on findings, recommend improvements.
- When assigned or in emergencies Coordinate all ramp handling functions.
- Investigate and complete In-Flight incident report.
- Conduct accident investigation and report on findings, recommend action.
- Coordinate, monitor and action as necessary spare parts storage and administration.
- Conduct audits of commissary inventory levels.
- In the absence of Manager, make, carry out and document decisions necessary to ensure the efficient operation of the work unit and protect company interests.

A05.1
.2

# Exhibit 2

